**In re Mark A. CROOKS and Debbie C. Crooks, Debtors.**

**No. 05–29236–BKC–JKO.**

United States Bankruptcy Court, S.D. Florida, Fort Lauderdale Division.

Sept. 27, 2006.

Weiner).

Donna A. Bumgardner, Tamarac, FL, for Debtors.

## ORDER OVERRULING TRUSTEE'S OBJECTION TO EXEMPTIONS

JOHN K. OLSON, Bankruptcy Judge.

This case presents an unusual fact pattern. Prior to the filing of their bankruptcy petition on October 14, 2005, the Debtors had been unable to purchase a home because of their poor credit history. A friend, Michael Rose, purchased a residence at 7320 N.W. 44th Court, Lauderhill, FL 33319 with the intent of transferring it to the Debtors. In the meanwhile, the residence was lived in by the Debtors. The house was insured by Rose with Tower Hill Insurance Group.

While owned by Rose and occupied by the Debtors, the house was damaged by one of South Florida's 2004 hurricanes. Shortly prior to the bankruptcy filing, Rose tendered to the Debtor Mark Crooks an insurance check from Tower Hill Insurance Group in the amount of $10,066.67, which Crooks placed in his account at Motorola Credit Union. The Debtors immediately spent some $3,500 of that amount on repairs to the house then-owned by Rose and occupied by them; the balance of some $6,500 remained in the credit union account.

Meanwhile, apparently because Rose didn't want to become entangled in the imminent bankruptcy filing by the Debtors, he quit claimed the residence to them one day before the petition was filed.[1]

Without apparent consideration of the implications of having received and spent part of these funds shortly before the bankruptcy filing, or the implications of leaving the balance in their credit union account, the Debtors filed their voluntary chapter 7 petition a few days later. The Debtors did not disclose the $6,500 amount (or the $3,500 already spent) on their initial bankruptcy schedules but did so in

---

1. The record is silent as to the purchase price, and as to whether the Debtors assumed or took subject to any mortgage debt. Given the Debtors' financial condition at the time and their inability to purchase a home on their own credit, I assume (but for purposes of this order do not have to know) that the house was encumbered by a mortgage entered into by Rose and that the Debtors took title subject to that mortgage.

amended schedules, and have claimed that balance, along with other funds and personal property, as exempt under Florida Statutes §§ 222.05 and 222.61, as well as Florida Constitution Article X, § 4(a)(2).

■ The Trustee timely objected to the claimed exemption. In his objection and subsequent brief, the Trustee correctly argues that insurance proceeds derived from damage to an exempt homestead retain and enjoy homestead character, citing *In re Gilley*, 236 B.R. 441 (Bankr.M.D.Fla. 1999) and are therefore exempt. However, because the Debtors did not own the house at the time of the damage, the Trustee argues that the funds could not be regarded as the proceeds of their homestead, and therefore are not exempt.[2]

The Trustee asserts that initial non-disclosure of the $10,000 in deposits into the credit union account suggests fraudulent intent and bad motives on the part of the Debtors, and that in any event, the funds in the Debtors' hands greatly exceed the $2,000 personal property exemption available to them. The Debtors denied any such intent and asserted that the deposits were exempt.

■ The Court conducted a hearing on the Trustee's objection on July 24, 2006. At the hearing, the Debtors filed an affidavit from Michael Rose in which he asserts that the $10,000 in insurance proceeds were entrusted by him to Mark Crooks "for the sole purpose of seeking repairs to the home" and that Crooks was "merely acting as agent for Mr. Rose in expending the insurance proceeds for repairs." Crooks himself testified and generally took the position that the funds "belonged to the house," not to him or his co-debtor wife.

Cash proceeds from an insurance policy don't, of course, belong to the house but to some person. Based on the Rose affidavit and Crooks' testimony, at which I observed Crooks' candor and demeanor, I am satisfied that what happened between Rose and the Debtors was inartful, ill-advised, but ultimately innocent. I find that the insurance proceeds were Rose's property when delivered to Crooks and were intended to be used solely to make hurricane damage repairs to the house which Rose owned at the time the insurance proceeds were given to Crooks earmarked for repairs. When Rose thereafter quitclaimed the house to the Debtors on the eve of their bankruptcy filing, the insurance proceeds were (as an economic matter) effectively part of the purchase price and continued to be held in trust by the Debtors for the sole purpose of making repairs. I do not find that the initial non-disclosure of these funds in the Debtors' schedules is indicative of fraudulent intent or bad motives, but rather of misunderstanding or incompetence. This is, in other words, an example of "pure heart, empty head" rather than an example of bad motive, fraudulent intent, or the like.

Because I find that the funds were held by the Debtors for Rose at the time of their transfer and thereafter, and were at all times held for a specific purpose, I find that these funds were not property of the Debtors at the time of the filing of the petition or thereafter, and did not become property of the estate.[3] The Trustee's

---

2. The Trustee also notes that the funds were not the proceeds of homestead property of Rose's, either, because the Lauderhill residence was not Rose's homestead. True; interesting; but irrelevant.

3. As noted in footnote 1, it is unclear from the record as to whether the house is subject to a mortgage. If it is, then it is most probable that the insurance proceeds are subject to the mortgage lien and would as a contractual matter have to be used by the Debtors or Rose

objection to exemptions is therefore over-ruled.

The Clerk is directed to provide a copy of this Order to all parties in interest.

to make repairs to the mortgagee's collateral—the same use to which the Debtors have apparently put them and consistent with Rose's affidavit. In this scenario, the interest of the mortgagee would be superior to that of the trustee and the Debtors would be holding the funds in trust for the mortgagee.